# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 11, 2019        Decided June 16, 2020

No. 19-1042

NEW YORK STOCK EXCHANGE LLC, ET AL.,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

Consolidated with 19-1043, 19-1046, 19-1049, 19-1053,
19-1054

———

On Petitions for Review of a Rule of
the Securities & Exchange Commission

———

*Thomas G. Hungar* argued the cause for petitioners. With him on the briefs were *Amir C. Tayrani*, *Joshua M. Wesneski*, *Paul S. Mishkin*, *George L. Brandley*, *Paul Greenwalt III*, and *Michael K. Molzberger*.

*Robert T. Smith* and *Eric T. Werlinger* were on the brief for *amici curiae* GTS Securities LLC, et al. in support of petitioners and vacatur of rule.

*Tracey A. Hardin*, Assistant General Counsel, Securities and Exchange Commission, argued the cause for respondent.

With her on the brief were *Michael A. Conley*, Solicitor, and *John B. Capehart*, Senior Counsel.

*Thomas A. Sporkin* was on the brief for *amicus curiae* RBC Capital Markets, LLC in support of respondent and denial of the petitions for review.

*Dennis M. Kelleher* and *Stephen W. Hall* were on the brief for *amicus curiae* Better Markets, Inc. in support of respondent.

*Hyland Hunt* and *Ruthanne M. Deutsch* were on the brief for *amicus curiae* Investors Exchange LLC in support of respondent.

*James A. Brigagliano*, *Eric D. McArthur*, and *Paul Schott Stevens* were on the brief for *amici curiae* Investment Company Institute, et al. in support of respondent and denial of the petitions for review.

Before: PILLARD, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Circuit Judge* PILLARD.

EDWARDS, *Senior Circuit Judge*: On December 19, 2018, purportedly acting pursuant to its authority under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*, the Securities and Exchange Commission ("Commission" or "SEC") adopted a Pilot Program, denominated Rule 610T, *reprinted in* Joint Appendix ("J.A.") J.A. 20-124. The Pilot Program was not a trial run of a new regulation. Rather, it was

designed "to gather data" so that the Commission *might* be able to determine in the future whether regulatory action was necessary. *Id.* at 21. In February 2019, the New York Stock Exchange LLC and other registered national securities exchanges ("Petitioners") filed timely petitions for review challenging Rule 610T.

An outline of Rule 610T is as follows:

> The Commission's plan is to assign 1,460 randomly selected stocks to one of two "Test Groups." Half of those stocks will be subject to a $0.0010 cap on the transaction fees that national securities exchanges can charge for executing trades—a substantial reduction of the current $0.0030 cap established by the Commission in 2005. Stocks assigned to the other Test Group will be subject to a prohibition on exchanges' payment of rebates to broker-dealers who send orders to the exchange for execution. All other publicly traded stocks will be assigned to a "Control Group" and will not be subject to either of these restrictions. And even with respect to the 1,460 stocks in the two Test Groups, the Rule's restrictions on fees and rebates will not apply evenhandedly: The Rule will apply to transactions in those stocks executed on national securities exchanges, but not to transactions on alternative trading systems ("ATSs") or other off-exchange trading venues, which together account for nearly 40% of securities transactions.

Br. for Petitioners at 1-2.

Petitioners contend that "[t]he Rule exceeds the Commission's statutory authority under the Exchange Act,

4

which does not authorize the Commission to change the regulatory standards applicable to transactions in publicly traded securities simply to determine the impact of those new standards on the securities market." *Id*. at 20. Petitioners also point out that "the Commission conceded that the Rule might 'harm execution quality and/or market quality,' increase transaction costs for investors, and impair competition." *Id*. at 21 (quoting J.A. 84). Petitioners additionally argue that Rule 610T cannot survive review because: (1) the Commission failed to determine the Rule's effects on efficiency, competition, and capital formation; (2) the Rule discriminates against some securities exchanges; and (3) the Commission failed to meaningfully consider alternatives to the Rule.

The Commission, in turn, contends that, although the Pilot Program is not expressly authorized by the Exchange Act, it is within the Commission's general rulemaking authority under 15 U.S.C. §§ 78w(a), 78k-1(a)(2). The Commission also claims that it was not required to adopt a "permanent" rule, nor prohibited from collecting data through experimentation. Finally, the Commission argues that its adoption of Rule 610T was reasonable because it considered and explained the economic consequences of the Pilot Program, as well as its possible effects on efficiency, competition, and capital formation, and considered alternatives proposed by Petitioners.

Because the SEC acted without delegated authority from Congress when it adopted Rule 610T, we will grant the petitions for review. The Pilot Program emanates from an aimless "one-off" regulation, *i.e.*, a rule that imposes significant, costly, and disparate regulatory requirements on affected parties merely to allow the Commission to collect data to determine whether there *might* be a problem worthy of regulation. Before acting, the Commission "identified a fundamental disagreement among exchanges, market

5

participants, academics, and industry experts regarding the impact of [maker-taker] fees and rebates on the markets." J.A. 56. However, the Commission took no position in these debates; and it did not identify any problems with existing regulatory requirements or propose rules that might rectify any perceived issues. Rather, according to the Commission, the purpose of Rule 610T was to induce "*an exogenous shock*" to the market that might offer insights into "the effects of fees and rebates on the markets and market participant behavior." J.A. 44. In other words, the Commission acted solely to "shock the market" to collect data so that it might ponder the "fundamental disagreements" between parties affected by Commission rules and then consider whether to regulate in the future. This was an unprecedented action that clearly exceeded the SEC's authority under the Exchange Act. *See* 15 U.S.C. § 78w(a)(2); *id*. § 78k-1(a)(2).

The Commission points to no authority that expressly authorizes it to adopt a "one-off" rule of this sort. Rather, the Commission argues that because it has rulemaking authority under the Exchange Act, the Pilot Program is permissible because "it is reasonably related to the purposes of the [SEC's] enabling legislation." Br. for Respondent at 24 (quoting *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973)). This is a shortsighted view of the applicable law. *Mourning* (the case cited by the Commission) was decided decades ago, before the Supreme Court issued *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), changing the framework for judicial review of agency action. And *Mourning* has been effectively diluted by later cases. *See*, *e.g.*, *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 92 (2002).

The controlling principle here is that "[a]n agency's general rulemaking authority does not mean that the specific

rule the agency promulgates is a valid exercise of that authority." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006). When an agency acts pursuant to its rulemaking authority, a reviewing court determines whether the resulting regulation exceeds the agency's statutory authority or is arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990). A court does not simply assume that a rule is permissible because it was purportedly adopted pursuant to an agency's rulemaking authority. *See Michigan v. EPA,* 135 S. Ct. 2699, 2706-07 (2015). Nor does a court presume that an agency's promulgation of a rule "is permissible because Congress did not expressly foreclose the possibility." *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002).

Nothing in the Commission's rulemaking authority authorizes it to promulgate a "one-off" regulation like Rule 610T merely to secure information that *might* indicate to the SEC whether there is a problem worthy of regulation. "Regardless of how serious the problem an administrative agency seeks to address . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *Ragsdale*, 535 U.S. at 91 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000)). The Commission acted without delegated authority when it adopted the Pilot Program. Accordingly, we grant the petition for review, vacate the Rule, and remand the case.

## I. Background

### A. Regulatory Background

#### 1. The Exchange Act

Section 11A of the Exchange Act authorizes the SEC "to facilitate the establishment of a national market system [NMS] for securities." 15 U.S.C. § 78k-1(a)(2). The Act directs the Commission, "having due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets, to use its authority" to achieve this goal. *Id.*

Section 23 of the Act gives the Commission "power to make such rules and regulations as may be necessary or appropriate to implement the provisions" of the Act for which it is responsible. *Id.* § 78w(a)(1). The Act also states that, "in making rules and regulations," the Commission:

> [(1)] shall consider . . . the impact any such rule or regulation would have on competition[;] . . . [(2)] shall not adopt any such rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of this chapter[;] . . . [and (3)] shall include in the statement of basis and purpose incorporated in any rule or regulation . . . , the reasons for the Commission's . . . determination that any burden on competition imposed by such rule or regulation is necessary or appropriate in furtherance of the purposes of this chapter.

*Id.* § 78w(a)(2).

### 2. Transaction Fee Structures

Petitioners and their affiliated exchanges are national securities exchanges registered with the Commission to provide trading in equity securities. *See id.* § 78f. The Commission regulates the principal functions of the exchanges' operations, including their transaction fees. *See id.* § 78f(b)(4).

According to the Commission:

NMS stocks are currently traded on 13 registered national securities exchanges and 32 Alternative Trading Systems ("ATSs")—non-exchange trading platforms that are subject to different regulatory treatment under the securities laws. Some orders are also "internalized" by broker-dealers, which fill them through their own systems. When the Pilot was adopted, approximately 66% of trading volume occurred on exchanges. The remaining 34% of trading volume occurred off-exchange at ATSs (14%) or internalizing broker-dealers and wholesalers (20%).

Broker-dealers consider a number of factors in choosing the trading venue for their orders, including quoted prices, transaction costs, routing incentives, impact of execution, and the certainty and speed of execution. The pricing and fee structures in place at various trading venues can thus have profound effects on the NMS, influencing market efficiency, competition between and among market participants and trading venues, broker-dealers' ability to obtain best execution for their clients, and the opportunities for execution of investors' orders.

A typical NMS transaction involves two parties: the "maker" who supplies liquidity by posting a displayed offer to buy or sell a security at a given price, and the "taker" of that liquidity who accepts the maker's offer. Historically, exchanges and other trading venues charged transaction fees to all parties to a trade on their systems. In the late 1990s, some venues began offering rebates to makers who posted liquidity on their venues. These rebates are typically subsidized by transaction fees charged to the taker, and where that fee is greater than the rebate, the venues retain the difference. This "maker-taker" fee model is now used by seven of the thirteen operating national equities exchanges and accounts for the majority of volume transacted across U.S. exchanges today. [Footnote 2: Four exchanges have a "taker-maker" model, in which they charge makers a fee and pay takers a rebate. Two others charge a flat (or no) fee and offer no rebates.]

Br. for Respondent at 6-7, 7 n.2 (footnote and citations omitted).

The record also indicates that exchanges offer rebates to "enhance liquidity by incentivizing broker-dealers to publicly display quotes and compete with one another in a manner that narrows the bid-ask spread to the ultimate benefit of all market participants. As a result, rebates have a beneficial effect on the price discovery and formation function that publicly displayed quotations provide." Comment Letter from Douglas A. Cifu, CEO, Virtu Fin. Inc., to Brent J. Fields, Sec'y, SEC 3 (May 23, 2018), J.A. 251. In addition, broker-dealers can use rebates "to help fund price improvement and payment for order flow programs for retail investors. As such, rebates indirectly provide benefits to retail investors in the form of better

execution prices and lower commission rates, both of which help reduce overall trading costs." *Id*. (footnote omitted).

### 3. Fee Caps

In 2005, the Commission adopted a rule prohibiting exchanges from imposing transaction fees in excess of $0.0030 per share for the execution of an order against a "protected quotation." *See* 17 C.F.R. § 242.610(c) (2020). The Commission determined that the fee limitation would "harmoniz[e] quotation practices and preclud[e] the distortive effects of exorbitant fees," and it selected the $0.0030 level because it was "consistent with current business practices." Br. for Petitioners at 9 (alterations in original) (quoting Regulation NMS, 70 Fed. Reg. 37,496, 37,545 (June 29, 2005)).

Ultimately, however, because of a continuing debate over whether the fee cap was appropriate and whether the maker-taker model furthered or frustrated Congress's goals for the national market system, the Commission proposed a transaction fee pilot program. The Pilot Program is discussed below.

### B. Factual Background

### 1. The Debate Leading to the Pilot Program

"For several years, academics and industry participants have questioned both whether the fee cap remains appropriate and whether the maker-taker model furthers or frustrates Congress's goals for the NMS." Br. for Respondent at 8. The Commission explained the situation, as follows:

[S]ome have questioned whether the prevailing fee structure has created a conflict of interest for broker-

dealers, who must pursue the best execution of their customers' orders while facing potentially conflicting economic incentives to avoid fees or earn rebates—both of which typically are not passed through the broker-dealer to its customers—from the trading centers to which they direct those orders for execution. . . . Others have expressed concern that maker-taker access fees may (a) undermine market transparency since displayed prices do not account for exchange transaction fees or rebates and therefore do not reflect the net economic costs of a trade; (b) serve as a way to effectively quote in sub-penny increments on a net basis when the effect of a maker-taker exchange's sub-penny rebate is taken into account even though the minimum quoting increment is expressed in full pennies; (c) introduce unnecessary market complexity through the proliferation of new exchange order types (and new exchanges) designed solely to take advantage of pricing models; and (d) drive orders to non-exchange trading centers as market participants seek to avoid the higher fees that exchanges charge to subsidize the rebates they offer.

By contrast, others have indicated that the maker-taker model may have positive effects by enabling exchanges to compete with non-exchange trading centers and narrowing quoted spreads by subsidizing posted prices. In particular, maker-taker fees may narrow displayed spreads in some securities insofar as the liquidity rebate effectively subsidizes the prices of displayed liquidity. In turn, that displayed liquidity may establish the national best bid and offer, which is often used as the benchmark for marketable order flow, including retail order flow, that is executed off-exchange by either matching or improving upon those

prices. Accordingly, retail orders may benefit indirectly from the subsidy provided by maker-taker exchanges.

Proposed Rules, Transaction Fee Pilot for NMS Stocks, 83 Fed. Reg. 13,008, 13,010-11 (Mar. 26, 2018), J.A. 127-28 (footnotes omitted).

The Commission expressed no views on these issues. Rather, it decided to adopt the Pilot Program.

## 2. The Proposal to Adopt a Pilot Program

On March 26, 2018, the Commission published a proposal to adopt an experimental program "to study the effects that transaction-based fees and rebates may have on, and the effects that changes to those fees and rebates may have on, order routing behavior, execution quality, and market quality more generally." Proposed Rules, Transaction Fee Pilot for NMS Stocks, 83 Fed. Reg. 13,008 (Mar. 26, 2018), J.A. 125-95. The Commission expressed no intention of promulgating new regulations on a trial basis. Instead, the Commission indicated that any pilot program would be adopted merely to collect information that might "facilitate a data-driven evaluation of the need for regulatory action." *Id*. at 125.

Initially, the Commission's proposal was

to create three test groups of 1,000 NMS stocks each and to cap the transaction fees at different levels: $0.0015/share for Test Group 1; $0.0005/share for Test Group 2; and for Test Group 3, permit transaction fees at the current $0.0030/share cap, but prohibit transaction rebates and "linked pricing." Trading data from stocks in these groups would be

13

analyzed against that of a control group, which would continue trading under existing rules. The pilot would apply to all equities exchanges, and all NMS stocks— including Exchange Traded Products ("ETPs")— would be subject to the pilot if they satisfied certain pricing and volume criteria.

Br. for Respondent at 12 (footnote and citations omitted).

The Commission solicited comments on this proposal and received 150 letters in response, which included many letters from issuers of publicly traded securities objecting to the proposed rule and seeking to opt out if the proposal was adopted. J.A. 30 n.137 (citing company issuer letters that expressed concern about how the Pilot Program would affect trading in their securities).

Before adopting a final rule, the Commission narrowed the design of its proposal. It "reduced the Pilot to two test groups instead of three, each containing 730 NMS stocks instead of 1,000." Br. for Respondent at 13. The Commission also "effectively combined the proposed $0.0015/share and $0.0005/share test groups into a single group with a $0.0010/share fee cap." *Id*. at 14. The final Pilot Program "continues to include as its second test group a 'zero rebate' group in which the existing $0.0030 fee cap applies, but rebates and linked pricing are prohibited. Likewise, the Pilot applies to 'all equities exchanges regardless of fee model' but not ATSs, and ETPs are subject to assignment in a Pilot test group if they satisfy the Pilot'[s] stock pricing and volume criteria." *Id*. (citation omitted). "The Pilot will automatically sunset after one year unless the Commission continues it for a second year, and it includes six-month pre- and post-Pilot periods to accommodate collection of benchmark data to assess the Pilot's effects." *Id*.

### 3. Rule 610T and the Pilot Program

On December 19, 2018, the Commission formally adopted Rule 610T. Transaction Fee Pilot for NMS Stocks, Release No. 34-84875 (Dec. 18, 2018), published at 84 Fed. Reg. 5202 (Feb. 20, 2019), J.A. 20-124. The Rule is outlined in the introduction to this opinion.

The purpose of the Pilot Program is vague. According to the Commission, the Pilot Program is intended to "facilitate an empirical evaluation of whether the existing exchange transaction-based fee and rebate structure is operating effectively to further statutory goals." *Id.* at 20. The Commission explained that it intended to gather data "to study fees and rebates that exchanges assess to broker-dealers and observe the impacts of those fees and rebates on the markets and market participants." *Id.* at 62. The Commission expressed the hope that the data would reveal "the extent . . . to which broker-dealers route orders in ways that benefit the broker-dealer but may not be optimal for customers, and the extent to which exchange pricing models create distortions that may have adverse impacts." *Id.* The Commission assumed that the data collected would "inform future regulatory initiatives to the ultimate benefit of investors." *Id.* The Commission also noted that, without the data, it could "use theory—and [its] best judgment based on [its] expertise—to guide [its] decision making." *Id.* at 66. However, the Commission expressed the belief that, in this case, "empirically assessing the various theories, causal impacts, and effects of the transaction fee-and rebate pricing model is appropriate." *Id.*

#### 4. The Troubling Aspects of the Pilot Program

As noted above, Rule 610T is a "one-off" regulation, *i.e.*, it imposes significant, costly, and disparate regulatory requirements merely to secure data that *may or may not* indicate to the SEC whether there is a problem worthy of regulation. There is no serious dispute between the parties over this.

Petitioners' concerns about the Pilot Program usefully highlight some of the troubling aspects of Rule 610T:

> [F]ar from finding that the Rule's requirements [are necessary or appropriate for the protection of investors, and for the maintenance of fair and orderly markets or that the Rule] will benefit market participants, the Commission conceded that the Rule might "harm execution quality and/or market quality," increase transaction costs for investors, and impair competition. JA84. . . .
>
> The Commission also failed to make a determination about the Rule's effects on efficiency, competition, and capital formation, *see* 15 U.S.C. § 78c(f), which the Commission declared itself "unable to determine *ex ante*," JA98. . . .
>
> In addition, the Rule . . . discriminates against issuers whose stock is included in the two Test Groups and against securities exchanges. . . . Because the Rule applies only to exchanges, not to off-exchange venues, it . . . disadvantages securities exchanges in comparison with ATSs and other off-exchange trading venues with which exchanges directly compete to attract order flow. The Commission failed

to provide a reasoned justification for . . . exempting off-exchange trading venues from new regulatory restrictions that will impede exchanges' ability to attract order flow.

Br. for Petitioners at 21-22.

In response, the Commission's brief to the court does not seriously deny that the Pilot Program would impose significant, costly, and disparate regulatory requirements. Rather, it says that:

> The Commission reasonably considered the economic consequences of the Pilot. It comprehensively explained the Pilot's potential costs and benefits, as well as its possible effects on efficiency, competition, and capital formation. It provided detailed, quantified estimates of those effects where it could, and exhaustive qualitative analyses where it could not.

Br. for Respondent at 22. The Commission objects that for it "to venture an unsupported guess about the Pilot's impact in the absence of the data the Pilot is designed to obtain would do nothing to further inform consideration of its potential economic consequences." *Id*. However, this objection does not really counter Petitioners' outline of some of the many uncontested costs and other adverse effects that will likely be caused by the regulatory requirements of the Pilot Program. *See* Br. for Petitioners at 15-18; *see also* J.A. 85-98 (setting forth the Commission's discussion of the anticipated costs of the Pilot Program).

In sum, it is clear from the record in this case that, if implemented, the regulatory requirements of Rule 610T would

have significant, costly, and disparate effects on the market and on regulated parties. It is also undisputed that the Pilot Program is not, and was never intended to be, a trial run of a new regulation. The Commission adopted the Pilot Program without any regulatory agenda. Indeed, the record makes it plain that the Commission does not know whether data from the Pilot Program might be useful. Nor does the Commission know whether it might pursue any regulatory initiatives at the conclusion of the Pilot Program if the plan is implemented.

## C.  Procedural History

On February 14 and 15, 2019, Petitioners filed their petitions for review in this court. As a protective measure, Petitioners filed additional petitions for review on February 21 and 25, 2019. Petitioners also filed a motion with the Commission seeking a stay of Rule 610T pending judicial review. The Commission granted in part the request for a stay, leaving unchanged the exchanges' data-compilation obligations. Order Issuing Stay in the Matter of Rule 610T of Regulation NMS, Exchange Release No. 34-85447, Admin. Proc. File No. 3-19124 (Mar. 28, 2019), https://www.sec.gov/rules/other/2019/34-85447.pdf.

**\* \* \* \***

Before turning to the merits of Petitioners' claims, we first address the Commission's challenge to Petitioners' standing to contest the Pilot's treatment of issuers. The Commission argues that Petitioners have no "standing to complain about the Pilot's potential effects on securities issuers because they have failed to show that any of the issuer-specific harms they allege would affect them." Br. for Respondent at 22. The Commission does not contest Petitioners' standing to challenge the Pilot Program on their own behalf.

In response, Petitioners argue, somewhat obscurely, that they "are the 'regulated parties' that would be injured by implementation of the Rule, and [their] argument that the Rule impermissibly discriminates against issuers would result in vacatur of the Rule *in its entirety*. Because that relief would provide 'redress for injuries done to' petitioners—rather than merely redress for injuries done to issuers—petitioners [contend that they] have standing to challenge the Rule's discrimination against issuers." Reply Br. for Petitioners at 20-21 (citations omitted).

We view this debate as much ado about nothing. In order to establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). And it is generally understood that, in establishing standing, a plaintiff must assert and rely on its own alleged injuries, not those of a third party who is not a plaintiff in the case. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017). However, the Supreme Court has made it plain that "[t]he fact that [a plaintiff's] injury may be suffered by a large number of people does not of itself make [the plaintiff's] injury a nonjusticiable generalized grievance." *Spokeo*, 136 S. Ct. at 1548 n.7.

In this case, the redress sought by Petitioners, vacatur, is for the alleged injuries that would be suffered by Petitioners if the Pilot Program is implemented. And the relief given by the court in this case is solely for the injuries that allegedly would be suffered by Petitioners. It is irrelevant that the relief afforded Petitioners may also benefit issuers. We understand that Petitioners suggest that the SEC's Pilot Program would cause

injuries to issuers as well as to Petitioners. However, we express no view on this claim and our judgment does not rest on it. Therefore, there is no concern about standing in this case.

## II. ANALYSIS

### A. Standard of Review

Petitioners' action is governed by the Court's seminal *Chevron* decision. Under *Chevron* step one, we must first decide "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842; *see also Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) ("[W]e begin with the language of the statute. If the . . . language is unambiguous and the statutory scheme is coherent and consistent . . . the inquiry ceases." (internal quotation marks and citation omitted)). If the statutory provision in question is "silent or ambiguous with respect to the specific issue," we then assess the matter pursuant to *Chevron* step two to determine whether the agency's interpretation "is based on a permissible construction of the statute." 467 U.S. at 843. *See generally* EDWARDS & ELLIOTT, FEDERAL STANDARDS OF REVIEW 211-22 (3d ed. 2018). "*Chevron* directs courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers. Even under this deferential standard, however, agencies must operate within the bounds of reasonable interpretation." *Michigan v. EPA*, 135 S. Ct. at 2707 (internal quotation marks and citations omitted).

"A precondition to deference under *Chevron* is a congressional delegation of administrative authority." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990). An agency is owed no deference if it has no delegated authority from Congress to act. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . .

unless and until Congress confers power upon it."). "Mere ambiguity in a statute is not evidence of congressional delegation of authority." *Michigan v. EPA,* 268 F.3d 1075, 1082 (D.C. Cir. 2001). And for an agency "[t]o suggest . . . that *Chevron* [deference is due] any time a statute does not expressly *negate* the existence of a claimed administrative power . . . is both flatly unfaithful to the principles of administrative law . . . and refuted by precedent." *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005) (first alteration and final two ellipses in original) (quoting *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc)).

Finally, under the Administrative Procedure Act, we will set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In applying the arbitrary-and-capricious standard of review, we must assure ourselves that an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983) (internal quotation marks omitted). We have also made it clear that the SEC has a "statutory obligation to determine as best it can the economic implications of [a proposed] rule." *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005); *see also Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011).

**B. The Commission Lacked Delegated Authority from Congress to Promulgate the Pilot Program**

The Commission argues that it properly invoked its rulemaking authority under section 23(a) of the Exchange Act when it promulgated the Pilot Program. In particular, the

Commission points out that, under the Exchange Act, it is empowered to "to make such rules and regulations as may be necessary or appropriate to implement the provisions of [the Act]," 15 U.S.C. § 78w(a)(1), and that this was sufficient to justify its adoption of Rule 610T. The Commission does not contend that it has explicit authority under the Exchange Act to adopt a "one-off" regulation like Rule 610T that imposes significant, costly, and disparate regulatory requirements merely to secure information that the Commission *may or may not* use in the future to determine whether there is a problem worthy of regulation. Indeed, the Commission can find no such delegated authority in the Exchange Act.

Furthermore, Section 23 of the Exchange Act states that the SEC "shall not adopt any . . . rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of [the Act]." 15 U.S.C. § 78w(a)(2). As explained above, it is uncontested that Rule 610T would impose significant burdens on competition. However, the Commission did not promulgate Rule 610T on a determination that the *regulatory requirements* of the Pilot Program (as distinguished from its objective of data collection) were necessary or appropriate to further the purposes of the Exchange Act.

In *Michigan v. EPA*, the Supreme Court set forth the principles that govern the disposition of this case:

> *Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.*

135 S. Ct. at 2706 (emphasis added) (internal quotation marks and citation omitted). As we explain below, the Commission

did not come close to satisfying these standards when it adopted the Pilot Program.

The Commission is of the view that the statutory reference to "regulations as may be necessary or appropriate" gave it authority to act, as it saw fit, without any other statutory authority to adopt the Pilot Program. The Supreme Court's decision in *Michigan v. EPA* debunks the Commission's position. In *Michigan v. EPA*, the Court makes it plain that the mere reference to "necessary" or "appropriate" in a statutory provision authorizing an agency to engage in rulemaking does not afford the agency authority to adopt regulations as it sees fit with respect to all matters covered by the agency's authorizing statute. 135 S. Ct. at 2706-07. In that case, for instance, the Court concluded that "EPA strayed far beyond th[e] bounds [of reasonable interpretation] when it read ["appropriate and necessary"] to mean that it could ignore cost when deciding whether to regulate power plants." *Id*. at 2707.

The larger point here is that an agency cannot purport to act with the force of law without delegated authority from Congress. *See Chevron*, 467 U.S. at 843-44; *see also Gonzales v. Oregon*, 546 U.S. 243, 258 (2006); *Sullivan*, 493 U.S. at 541. "[T]he question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). And deference under *Chevron* step two is premised on either an "express delegation of authority" or an "implicit" "legislative delegation to an agency." *Chevron*, 467 U.S. at 843-44; *see also Am. Library Ass'n v. FCC*, 406 F.3d 689, 705 (D.C. Cir. 2005); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003).

Merely because an agency has rulemaking power does not mean that it has delegated authority to adopt a particular regulation. *See, e.g., Sullivan*, 493 U.S. at 528, 541; *see also Ragsdale*, 535 U.S. at 92. As noted at the outset of this opinion, "[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Colo. River Indian Tribes*, 466 F.3d at 139. And "[w]ere courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc).

In this case, the Commission adopted the Pilot Program without any regulatory agenda. That is, the Commission acted without explaining what problems with the existing regulatory requirements it meant for the Rule to correct. Rather, the Commission promulgated Rule 610T on the belief "that the success or failure of the Pilot will be determined by whether it produces an exogenous shock that generates measurable responses capable of providing insight into the effects of fees and rebates on the markets and market participant behavior." J.A. 44. "In the name of collecting 'data' for 'subsequent' regulatory decisions 'that the Commission can neither predict nor commit to at this time,' it wants to 'shock' the market by upheaving the current fee-and-rebate incentive structure— solely to judge reactions." Br. for Amicus in Support of Petitioners at 17-18. The Commission also made it clear "that there is significant uncertainty regarding the effect, if any, that the Pilot will have on liquidity and trading volume on exchanges." J.A. 98. And faced with conflicting claims from commentators regarding whether the Pilot Program would harm efficiency, competition, and capital formation, the Commission simply said that it was "unable to determine *ex*

*ante*" how the Pilot will impact the market. *Id*. Nothing in the Exchange Act gives the Commission authority to follow this aimless regulatory approach.

Indeed, as noted above, Section 23 of the Exchange Act forbids the Commission from adopting a rule that will unnecessarily burden competition, 15 U.S.C. § 78w(a)(2), and this statutory command was not met. It is also noteworthy that the *regulatory requirements* of the Pilot Program were adopted to collect data, not to maintain "fair and orderly markets," 15 U.S.C. § 78k-1(a)(2), as required by the Exchange Act. The record thus indicates that the Commission acted with no obvious regard for the limits on its regulatory authority under the Exchange Act.

If implemented, the Pilot Program would have serious, market-altering effects. It is not merely a benign quest for data, as the Commission appears to suggest. Although the Commission has no regulatory mission, and it insists that the Pilot Program is not meant to be a trial of a new regulation, the fact is that Rule 610T *establishes major regulatory requirements*. However, the Commission has no delegated authority to promulgate a "one-off" regulation like Rule 610T that imposes significant, costly, and disparate regulatory requirements merely to secure information that *may or may not* indicate to the SEC whether there is a problem worthy of regulation. If agencies were allowed to regulate in this way, absent delegated authority from Congress, the ramifications would be extraordinary.

The Commission claims "that the Pilot will provide useful data that will better inform future policy recommendations of the effects of fees and rebates on price efficiency." J.A. 98. Even if the Commission has authority to seek data from regulated parties, it does not follow that the Commission may

impose new and stringent regulatory requirements designed to "shock" the market. J.A. 44 & n.304. This is especially true in this case, where: (1) the Commission has never previously adopted a "one-off" regulation such as Rule 610T without congressional authority; (2) the Commission has no regulatory agenda (either for the present or the future) supporting the Pilot Program; (3) the Commission has taken no position on the conflicting views expressed by members of the regulated community and other commentators regarding the efficacy of the disputed Rule; (4) the Commission concededly cannot reasonably assess the effects of the new Rule; and (5) the Commission has no real idea whether the data collected will be useful or to what end. The Commission's action is not only unprecedented, it finds no support in the law.

As noted above, the Commission relies heavily on *Mourning*, 411 U.S. 356, to support its claim that it has delegated authority to adopt Rule 610T. The Commission argues that the Pilot Program is permissible because it is "reasonably related to the purposes of the [Exchange Act]." Br. for Respondent at 25 (alteration in original) (quoting *Mourning*, 411 U.S. at 369). This argument fails.

First, as we have already explained, *Michigan v. EPA*, which post-dates *Mourning*, makes it clear that a "necessary or appropriate" provision in an agency's authorizing statute does not necessarily empower the agency to pursue rulemaking that is not otherwise authorized. There is nothing in the Exchange Act that authorizes a "one-off" regulation like Rule 610T.

Second, the Supreme Court's decision in *Ragsdale*, 535 U.S. 81, indicates that the statement in *Mourning*, to which the Commission refers, has little play in the post-*Chevron* area. *Ragsdale* says that the Court's "previous decisions, *Mourning* included, do not authorize agencies to contravene Congress'

will" by adopting an unauthorized regulation. *Ragsdale*, 535 U.S. at 92. And, as the Court pointed out in *Ragsdale*, the agency's rulemaking authority in *Mourning* was broad enough to cover the rule at issue in that case. *Id.* (citing *Mourning*, 411 U.S. at 361-62, 371, 376). That is not the situation in this case.

*Mourning* simply suggests that when an agency acts pursuant to a clear and broad "empowering provision," "courts will sustain a regulation that is 'reasonably related' to the purposes of the legislation." *Doe, 1 v. FEC*, 920 F.3d 866, 870-71 (D.C. Cir. 2019) (quoting *Mourning*, 411 U.S. at 369). It is noteworthy that the court's decision in *Doe* only cites *Mourning* after finding that the agency action at issue was within the bounds of its delegated authority. This is the thrust of the Supreme Court's decisions in *Ragsdale*, 535 U.S. at 92 and *Sullivan*, 493 U.S. at 528. In other words, "*Mourning* applies only after a court has determined that Congress has indeed delegated interpretative powers to [an] agency." *Chamber of Commerce of U.S. v. NLRB*, 721 F.3d 152, 158 (4th Cir. 2013).

The Commission also cites *United Telegraph Workers v. FCC*, 436 F.2d 920 (D.C. Cir. 1970), in support of its claim that it permissibly adopted the Pilot Program under its rulemaking authority. However, the decision in *United Telegraph Workers*, which predates the Supreme Court's decision in *Michigan v. EPA*, is easily distinguished. In that case, this court rejected a challenge to a decision by the FCC not to suspend a proposed tariff for a new telegram service offered for a two-year experimental period. In denying the petition for review, the court noted that Congress had directed the FCC "to inform itself of technical advancements and improvements," and there was no statutory prohibition against that type of experimental program at issue in the case. *Id.* at 923-24. It is also noteworthy that in *United Telegraph*

*Workers*, the agency implemented a rule to demonstrate that it was a feasible regulatory solution to an identifiable problem, *id.* at 921, 923-24, not to "shock" the market solely to judge reactions.

Normally, unless an agency's authorizing statute says otherwise, an agency regulation must be designed to address identified problems. *See Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (holding that "[a] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy"). Rules are not adopted in search of regulatory problems to solve; they are adopted to correct problems with existing regulatory requirements that an agency has delegated authority to address. That is not the situation that we see in this case.

One more point should be stressed regarding the Commission's claim that it acted pursuant to delegated authority from Congress. As already noted, the Commission does not claim that it had express authority to adopt a "one-off" regulation of the sort at issue here. Instead, the Commission argues that it had *implied* authority under the Exchange Act to adopt the Pilot Program and, therefore, its decision is due deference under *Chevron* step two. *See* Br. for Respondent at 25. We find no merit in this claim.

As explained above, it is well understood that an agency action cannot be "permissible" under *Chevron* step two if the agency acts in excess of its authority under the applicable statute, *see, e.g., Goldstein v. SEC,* 451 F.3d 873, 878 (D.C. Cir. 2006), or if the agency's interpretation of the statute is unreasonable, *see, e.g.*, *Michigan v. EPA*, 135 S. Ct. at 2708, 2712. *See generally* EDWARDS & ELLIOTT, *supra*, at 223-24, 226-30. It does not matter that the statute is arguably ambiguous. *See,*

*e.g.*, *Michigan v. EPA*, 268 F.3d at 1082 ("Mere ambiguity in a statute is not evidence of congressional delegation of authority."); *see also Glob. Tel\*Link v. FCC*, 866 F.3d 397, 418 (D.C. Cir. 2017) (Silberman, J., concurring) (pointing out that *Chevon* step two is "a meaningful limitation on the ability of administrative agencies to exploit statutory ambiguities, assert farfetched interpretations, and usurp undelegated policymaking discretion"). Nor does it matter that a disputed agency action is not expressly foreclosed by the statute. *See Am. Bar Ass'n*, 430 F.3d at 468 (rejecting agency suggestion "that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power" (quoting *Ry. Labor Execs.' Ass'n*, 29 F.3d at 671 (en banc))); *Motion Picture Ass'n of Am.*, 309 F.3d at 805 (same).

In advancing the claim that it had *implied* authority to adopt Rule 610T, the Commission confuses the issues by debating with Petitioners over its right to adopt rules implementing "experimental initiatives." That is not the issue in this case, however. The problem in this case is that the Commission acted in excess of its authority under the exchange Act. It adopted the Pilot Program without any regulatory agenda. The Commission acted without explaining what problems with the existing regulatory requirements it meant to address. And the Commission proposed to impose significant, costly, and disparate regulatory requirements on only a subset of the securities market just to gather data. In other words, in adopting the Pilot Program, the Commission acted "on a bare desire to conduct an information-gathering experiment to justify the Rule's restrictions." Br. for Petitioners at 28. Nothing in the Exchange Act – either express or implied – authorizes this.

This conclusion is only reinforced by Petitioners' observation that, unlike Rule 610T, the Commission's "Tick

Size Pilot" – an experimental rule whose disputed effects bear on Petitioners' arbitrary-and-capricious claim – "was the result of a statutory command from Congress, which directed the Commission to study the impact of the current tick size on the number of initial public offerings." Br. for Petitioners at 18 n.5 (citing Jumpstart Our Business Startups Act, Pub. L. No. 112-106, § 106(b), 126 Stat. 306, 312 (2012)); *see* 15 U.S.C. § 78k-1(c)(6). There is no such congressional directive authorizing the Pilot Program.

In short, the Commission's action exceeds its authority under the Exchange Act. Therefore, the Commission is due no deference under *Chevron*. As Justice Thomas noted in his concurring opinion in *Michigan v. EPA*, "[a]lthough we hold today that [the agency] exceeded even the extremely permissive limits on agency power set by our precedents, we should be alarmed that it felt sufficiently emboldened by those precedents to make the bid for deference that it did here." 135 S. Ct. at 2713 (Thomas, J., concurring).

## C. Petitioners' Claim that the Commission's Adoption of the Pilot Program Defied Reasoned Decision Making

The analysis of disputed agency action under *Chevron* step two and arbitrary and capricious review is often "the same, because under *Chevron* step two, [the court asks] whether an agency interpretation is 'arbitrary or capricious in substance.'" *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011) (quoting *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011)). In some circumstances, agency action that is impermissible under *Chevron* step two is also unreasonable under the arbitrary and capricious standard articulated in *State Farm*. *See* 463 U.S. at 42-44. A good example of such a case is the Court's decision in *Michigan v. EPA*, discussed above. In that case, the Court found that the EPA's interpretation of

the statute was unreasonable and, thus, due no deference under *Chevron* step two. The Court also found that the agency's regulatory action was not based on reasoned decision making, and therefore was arbitrary and capricious. 135 S. Ct. at 2706-07.

This case presents a situation that is similar to what the Court faced in *Michigan v. EPA*. Petitioners argue that:

> [W]hen the Commission adopts a rule imposing new regulatory standards for the national market system—regardless of whether it labels the rule an experimental "pilot" measure—it must satisfy the requirements that apply to all such rulemakings, which include demonstrating that its regulatory action is "necessary or appropriate in the public interest," for the protection of investors, and for the maintenance of fair and orderly markets. 15 U.S.C. § 78c(f); *see also id.* § 78k-1(a)(2). The Commission did not make any of those findings with respect to the new fee cap and rebate restrictions imposed by the Rule. . . .

> The Commission also failed to make a determination about the Rule's effects on efficiency, competition, and capital formation, *see* 15 U.S.C. § 78c(f), which the Commission declared itself "unable to determine *ex ante*," JA98. The Commission's claim that it was unable to make this statutorily mandated determination flouts its obligation under the Exchange Act "to determine as best it can the economic implications of the rule it has proposed." *Chamber of Commerce of the United States v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005).

Br. for Petitioners at 20-22.

Likewise, Amicus points out that:

> [N]umerous commenters came forward with arguments and evidence demonstrating that the Transaction Fee Pilot would harm efficiency, competition, and capital formation. Others came forward with arguments and evidence to the contrary. Faced with this evidence, the Commission cannot just throw up its hands and say that it is "unable to determine *ex ante*" how the Pilot will impact the market.
>
> This shortcoming matters because there is no way the Commission could have conducted a proper cost-benefit analysis without actually making a judgment call as to the degree of harm the Pilot would inflict.

Br. for Amicus in Support of Petitioners at 19-20 (footnotes and citation omitted).

These claims focus on the Commission's alleged failure to satisfy the requirements of reasoned decision making when it adopted the Pilot Program. The Commission claims that it was unable to complete a thorough analysis of the possible effects of the Pilot Program "because it lack[ed] the information necessary to provide reasonable estimates" of the "economic effects" of its Rule. J.A. 64. Petitioners argue that the Commission's response defies the commands of *State Farm*, 463 U.S. at 43, and, therefore, the Commission's promulgation of the disputed Rule was arbitrary and capricious.

As the Court said in *State Farm*, "[r]ecognizing that policymaking in a complex society must account for uncertainty . . . does not imply that it is sufficient for an agency

to merely recite the terms 'substantial uncertainty' as a justification for its actions." 463 U.S. at 52; *see also Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (discussing the requirements of reasoned decision making); *Chamber of Commerce of U.S. v. SEC*, 412 F.3d at 143 (holding that, even when the SEC has difficulty in determining the cost of compliance of a proposed rule, and it can determine only the range within which the cost of compliance will fall, this "does not excuse the Commission from its statutory obligation to determine as best it can the economic implications of the rule it has proposed"); *Bus. Roundtable*, 647 F.3d at 1150 (holding that "[b]ecause the [SEC] failed to 'make tough choices about which of the competing estimates is most plausible, [or] to hazard a guess as to which is correct,' . . . it neglected its statutory obligation to assess the economic consequences of its rule" (third alteration in original) (citation omitted) (quoting *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004))).

According to Petitioners, the Commission failed reasoned decision making because it never explained its regulatory agenda (if it had one), and it failed to assess whether the perceived benefits of the Pilot Program justified the substantial costs imposed by the new regulatory requirements. In other words, Petitioners contend that reasoned decision making would have required the Commission to have some goals in mind – apart from the mere collection of data – and to show, not that the perceived benefits of the Pilot Program's new regulatory requirements exceeded the costs, but that the *new regulatory requirements* were reasonable and justified under the standards enunciated in the Exchange Act.

Because we hold that the Commission lacked delegated authority to adopt the Pilot Program, it is unnecessary for us to determine whether the Commission's adoption of the Rule

violated the commands of *Michigan v. EPA* and *State Farm* regarding the requirements of reasoned decision making. *See Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (holding that because the court was vacating and remanding the matter on another ground, there was no reason to address other objections to the contested rule).

## III.  CONCLUSION

We grant the petitions for review and vacate Rule 610T and the Pilot Program. The case will be remanded to the Commission for further proceedings consistent with this opinion.

PILLARD, *Circuit Judge,* concurring: I agree that the validity of the Pilot turns on whether it is a response to an identified problem within the regulatory ambit of the U.S. Securities and Exchange Commission (SEC or the Commission). *See* Op. at 27. The Commission needed to take the position that there is a problem in its markets before it could determine whether its Pilot was an appropriate and necessary step towards a solution. I write separately to stress that this is a closer case than my colleagues might be read to suggest.

It is evident from the face of the record that the Commission worries, as do many commenters and market participants, that the current fee structure may distort the market and harm investors. The Commission certainly has statutory authority to promulgate temporary rules designed to better inform its governance of fair and orderly markets. And the Pilot represents the culmination of painstaking thought and research into how to verify whether and why the suspected market distortion exists. But I agree with my colleagues that, in the final analysis, the rule fails our review because the Commission has not identified the problem it seeks to resolve nor explained how the results would guide future SEC action.

## I.    The Commission's statutory authority

The same power the Commission has used to regulate transaction fees includes authority to promulgate a pilot to test whether the fee structure is working as intended when substantial evidence suggests it is not. Section 23 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (Exchange Act or the Act), grants the Commission general rulemaking authority "to make such rules and regulations as may be necessary or appropriate to implement the provisions" of the Act, *id.* § 78w(a)(1). The relevant provision the Commission seeks to implement in regulating national exchanges is Section 11A, in which Congress directed the Commission to establish a national market system for

securities. *Id.* § 78k-1. The fee cap in Rule 610(c) is the product of Commission rulemaking under its Section 23 and Section 11A authority, and nobody disputes that those provisions authorize the Commission to change the cap. If the Commission meets the Administrative Procedure Act's requirements for reasoned decision making, the Commission can retain the current fee cap, or modify it, including along the lines of either of the Pilot's control groups. As it proposes for Test Group 1, the Commission could lower the fee cap. And, as it proposes for Test Group 2, it could keep the current cap but prohibit rebates. Or, presumably, the Commission could raise the fee cap, or apply the cap only to specific kinds of transactions, so long as it had reasoned justifications for doing so.

Petitioners do not dispute the Commission's authority to "engage in 'experimental action'—including action designed to gather data to facilitate future regulatory decision-making— as long as the Commission first determines that the regulatory requirements imposed by that experiment satisfy the same standards applicable to all other Commission rules." Reply Br. 7; *see also* Pet'r Br. at 24-25, 29; Oral Arg. Rec. at 4:15-6:45, 8:50-9:25, 16:25-17:32. My colleagues likewise emphasize that the Commission's "right to adopt rules implementing 'experimental initiatives'" is "not the issue in this case." Op. at 28.

Indeed, the Commission has a history of conducting pilot programs without specific congressional intervention. Congress's Tick Size Pilot suggestion in the 2014 Small Cap Liquidity Reform Act of 2014, H.R. 3448, 113th Cong. § 2, passed only the House and did not become law, but the Commission nevertheless took its cue from Congress and conducted that pilot under its own authority, *see* Order Approving the National Market System Plan to Implement a

3

Tick Size Pilot Program, 80 Fed. Reg. 27,514, 27,514-15 (May 13, 2015).[1]  The Commission's Limit-Up Limit-Down Pilot in 2012 was proposed at least in part by the Petitioners in this case and adopted by the Commission.  *See* Joint Industry Plans; Order Approving, on a Pilot Basis, the National Market System Plan to Address Extraordinary Market Volatility, 77 Fed. Reg. 33,498 (June 6, 2012).  One of the commenters on the proposed Rule 610T noted that there "are 17 Commission sponsored pilots currently pending, some of which have been running for several years."  Virtu Financial, Comment Letter on Proposed Transaction Fee Pilot for NMS Stocks 1 n.2 (May 23, 2018), http://www.sec.gov/comments/s7-05-18/s70518-3694150-162460.pdf (Virtu Financial Comment Ltr.).  The issue here is not whether the Commission has statutory authority to promulgate test or pilot rules to help inform its efforts to solve identified problems in the equities markets.  It assuredly does.[2]

---

[1] Although the majority points to the JOBS Act direction from Congress to study the impact of decimalization, Op. at 29 (citing Jumpstart our Business Startups Act, Pub. L. No. 112-106, § 106(b), 126 Stat. 306, 312 (2012)), the JOBS Act was no more specific about pilots or experimentation than is the Commission's general regulatory authority.  The Commission responded to the congressional "study" directive by submitting a report to Congress in July 2012.  80 Fed. Reg. at 27,515.  After further convening a Decimalization Roundtable in February 2013, it issued an order in June 2014 under its own authority to develop a pilot, and approved the pilot plan in May 2015.  *See id.*; *see also* U.S. Securities & Exchange Comm'n, Assessment of the Plan to Implement a Tick Size Pilot Program 4 (rev. Aug. 2, 2018), https://www.sec.gov/files/TICK%20PILOT%20ASSESSMENT%20FINAL%20Aug%202.pdf.

[2] The Commission does not rely on "implied" authority to adopt the Pilot. *Cf.* Maj. Op. at 27-28 (citing Resp't Br. at 25).  To the contrary, the Commission's only discussion of implication with regard to its

4

When the Commission enacts a pilot program via rule, it must stay within its statutory authority to "make such rules and regulations as may be necessary or appropriate" to carry out its statutory mandate under the Exchange Act, 15 U.S.C. § 78w(a)(1), namely, "having due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets, . . . to facilitate the establishment of a national market system," *id.* § 78k-1(a)(2). To act consistently with its statutory mandate, the Commission must evaluate "whether an action is necessary or appropriate in the public interest" to provide for "the protection of investors" and also consider the "promot[ion of] efficiency, competition, and capital formation." *Id.* § 78c(f). The Commission is obligated to determine that "any burden on competition imposed" by its rules be "necessary or appropriate in furtherance of the [Act's] purposes." *Id.* § 78w(a)(2).

The Commission has statutory authority to promulgate information-gathering rules even at some cost to market participants. But, as with any rule, it must identify a non-arbitrary basis for doing so. In order to evaluate whether a rule is "necessary and appropriate" under the Exchange Act, the Commission must spell out the need for any proposed rule and its potential drawbacks. *Id.* § 78w(a)(1).

_____

statutory authority is its rejection of any "implicit" exception to its "otherwise unqualified grant of rulemaking authority" that would prevent it from promulgating "experimental initiatives." Resp't Br. at 25.

## II.  SEC Regulation of Transaction Fees

### A.  Rule 610(c) fee cap

The record shows that the Commission has spent several years considering significant arguments and evidence that the current fee structure distorts the market in ways that harm investors. Concerns were voiced over the impact of fee-and-rebate structures on the securities markets at least as early as 2005. In response to those concerns, the Commission adopted the cap on fees in Rule 610(c), the underlying rule that the Rule 610T Pilot addresses. *See* Regulation NMS, 70 Fed. Reg. 37,496, 37,545 (June 29, 2005) (codified at 17 C.F.R pt. 242.600-612) (Regulation NMS). Regulation NMS, of which Rule 610(c) was a part, was the broad regulation adopted by the Commission in 2005 that "established the regulatory framework within which the markets transitioned from a primarily manual to a primarily automated trading environment." Proposed Rule: Transaction Fee Pilot for NMS Stocks, 83 Fed. Reg. 13,008, 13,008 (Mar. 26, 2018) (Proposed Rule) (citing Regulation NMS, 70 Fed. Reg. at 37,543-46). Rule 610(c) caps at $0.0030 per share the allowable fee for executing an order on a national exchange. *See* 17 C.F.R. 242.610(c).

Maker-taker exchanges use the access fees paid by "takers" to fund rebates to the brokers that "make" liquidity by posting offers to buy or sell. *See* Proposed Rule, 83 Fed. Reg. at 13,009. On maker-taker exchanges, the "makers" are those who post offers to buy or sell, thus "making" liquidity, whereas the "takers" accept posted offers by buying at the ask price or selling at the bid price, thus "taking" liquidity. *Id.* Although Rule 610(c) does not directly cap rebates, only fees, as a practical matter the rule indirectly limits rebates to $0.0030 per share because that is the cap on any fee available to fund a

6

corresponding rebate. *Id.* at 13,010. Maker-taker exchanges allow brokers to earn revenue from maker fees, and exchanges to earn revenue by charging more to the "taker" of liquidity than they rebate to the "maker" of liquidity. *Id.* at 13,009.

The Commission enacted Rule 610(c) under its authority in Sections 23 and 11A of the Exchange Act to ensure the enumerated statutory objective of the "fairness and usefulness of quotation information." Regulation NMS, 70 Fed. Reg. at 37,545. It concluded that "[a]ccess fees tend to be highest when markets use them to fund substantial rebates to liquidity providers, rather than merely to compensate for agency services." *Id.* And the Commission reasoned that, if exchanges were "allowed to charge high fees and pass most of them through as rebates, the published quotations of such [exchanges] would not reliably indicate the true price that is actually available to investors or that would be realized by liquidity providers." *Id.*

## B. The lead-up to Pilot Rule 610T

Rule 610T is the result of almost 10 years of rigorous SEC planning and study. As early as 2010, the Commission expressed concerns with the increasingly prevalent maker-taker model. The Commission conducted "a broad review of the current equity market structure" by issuing a "Concept Release" that sought public comment on a "wide range of market structure issues" to inform regulatory initiatives. Concept Release on Equity Market Structure, 75 Fed. Reg. 3,594, 3,594 (Jan. 21, 2010).

Among the issues the Commission's review flagged was the emerging norm of high rebates offered by maker-taker exchanges. It noted that the increasing dominance of "[h]ighly automated exchange systems and liquidity rebates have helped

establish a business model for a new type of professional liquidity provider." *Id.* at 3,599. In this business model, "proprietary trading firms and the proprietary trading desks of multi-service broker-dealers now take advantage of . . . liquidity rebates by submitting large numbers of non-marketable orders (often cancelling a very high percentage of them), which provide liquidity to the market electronically." *Id.* In other words, these broker-dealers engage in "passive market making strategies," earning income through posting a huge number of bids and offers at different prices and sizes, but selectively following through on only a small fraction of their bids and offers, cancelling 90% or more that are not executed within one second or less. *Id.* at 3,607. They profit on the transactions they complete both by "earning the spread," or the difference between their posted bid price and ask price, and by taking care to transact from the "maker" position to garner rebates and avoid fees. *Id.*

The Commission sought input on the quality of the liquidity created by these new, high-frequency proprietary trading firms in comparison to traditional, over-the-counter liquidity providers: "[A]re their orders accurately characterized as phantom liquidity that disappears when most needed by long-term investors and other market participants?" Or, are they creating a "relatively stable quoted market in which there are many quotation updates . . . but relatively few changes in the price[?]" *Id.* at 3,608. The Commission also asked for comment on the benefits and drawbacks of rebates themselves: "Are liquidity rebates unfair to long-term investors because they necessarily will be paid primarily to proprietary firms engaging in passive market making strategies? Or do they generally benefit long-term investors by promoting narrower spreads and more immediately accessible liquidity?" *Id.*

8

Concern over the maker-taker pricing model gained steam in 2015. *See* Proposed Rule, 83 Fed. Reg. at 13,010 & nn.21-22 (citing Stanislav Dolgopolov, *The Maker-Taker Pricing Model and its Impact on the Securities Market Structure: A Can of Worms for Securities Fraud?*, 8 Va. L. & Bus. Rev. 231 (2014); Robert H. Battalio, Shane A. Corwin & Robert H. Jennings, *Can Brokers Have it All? On the Relation Between Make-Take Fees and Limit Order Execution Quality*, 71 Journal of Finance 2193 (2016)). Nasdaq, a Petitioner in this case, conducted its own study of the model in 2015 by lowering access fees and rebates for transactions involving 14 stocks over a 4-month period. *See id.* at 13,011. The Commission's Equity Market Structure Advisory Committee (EMSAC), in its October 2015 meeting, also scrutinized potential broker-dealer conflicts of interest in maker-taker fee models, including conflicts inherent in broker-dealers choosing to route client orders to the venues offering the highest rebates instead of sending them where trades could be executed most beneficially to their clients. *See* Transcript, U.S. Securities & Exchange Comm'n, EMSAC Meeting (Oct. 27, 2015), https://www.sec.gov/spotlight/emsac/emsac-102715-transcript.txt. The EMSAC examined the academic literature, the Nasdaq study, and a detailed internal memo from the Commission's Division of Trading and Markets. *See* U.S. Securities & Exchange Comm'n, Equity Market Structure Advisory Committee Archives, https://www.sec.gov/spotlight/emsac/emsac-archives.htm (last modified Nov. 18, 2016). And it heard presentations from varied stakeholders and perspectives, including academics and representatives from Vanguard, NYSE, The Capital Group, Chicago Stock Exchange, J.P. Morgan, Morgan Stanley, and Nasdaq. *See* U.S. Securities & Exchange Comm'n, Equity Market Structure Advisory Committee—Agenda for October 27, 2015, Meeting, https://www.sec.gov/spotlight/emsac/emsac-agenda-102715.shtml (last modified Oct. 20, 2015).

The EMSAC created a Regulation NMS Subcommittee that first convened in November 2015 to examine the maker-taker fee model. *See* Proposed Rule, 83 Fed. Reg. at 13,012 n.35. The subcommittee held a series of meetings over the ensuing months as it outlined "a potential access fee pilot," which it presented to the full EMSAC in April 2016. *Id.* at 13,012. With input from the full body, the Regulation NMS subcommittee then revised its recommendation and resubmitted it to the EMSAC which, by a vote of 15-1, recommended in July 2016 that the Commission pursue an access fee pilot. *Id.* at 13,012 & n.38. The EMSAC recommended the pilot as a means for the Commission "to better understand . . . the effect of access fees on liquidity provision, liquidity taking and order routing with the ultimate goal of improving market quality." *Id.* at 13,012 (quoting EMSAC, Recommendation for an Access Fee Pilot (July 8, 2016), https://www.sec.gov/spotlight/emsac/recommendation-access-fee-pilot.pdf).

For more than a year, commenters to the Commission, including Petitioners in this case, analyzed and suggested modifications to various particulars of the EMSAC's model pilot. *See* Proposed Rule, 83 Fed. Reg. at 13,012-14. By March 2018, the Commission arrived at its proposed version of an access fee pilot. It published notice in the Federal Register and invited formal comment. *Id.* at 13,008. Approximately a year later, having developed responses to public comments and adjusted the proposed Pilot, the Commission published its final Pilot. *See* Final Rule: Transaction Fee Pilot for NMS Stocks, 84 Fed. Reg. 5,202 (Feb. 20, 2019) (Rule 610T). The pre-Pilot period was scheduled to take effect July 1, 2019, which would have allowed the Pilot itself to commence on January 1, 2020. Notice Establishing the Commencement and Termination Dates of the Pre-Pilot Period of the Transaction Fee Pilot for

National Market System Stocks, 84 Fed. Reg. 24,563, 24,563 (May 28, 2019).

> **C.**      **Pilot Rule 610T proposes to test the impact of transaction-based pricing models via adjusting the Rule 610(c) fee cap**

As might be expected of the product of years of informal and formal public discussion, comment, and revision, Rule 610T describes in detail problems perceived by the current fee structure's detractors. The way the opinion for the court describes the record and context of the challenged rule suggests that the rule is more flawed—and our decision easier—than I find them to be. The opinion draws substantially on the briefs of Petitioners—the Nasdaq, NYSE, and Cboe equities exchanges that profit from the maker-taker model—*see, e.g.*, Op. at 3, 15-16, 30, 32, and the brief of their amici—GTS Securities LLC, Citadel Securities LLC, and IMC Chicago, LLC, three market maker broker-dealers that, under the critics' theory, are benefitting from the current fee structure at the expense of other market participants, *see, e.g.*, Op. at 23, 31; *see also id.* at 9 (quoting comment letter from self-described "leading technology-enabled market maker and liquidity provider," Virtu Financial Comment Ltr. at 1 n.1). But they tell only part of the story.

Problems with the existing fee structure are documented in the record and elaborated in four amicus briefs submitted on behalf of a wide range of participants in the equities markets.[3]

---

[3] Those market-participant amici describe the current system as distorting the market and harming investors. Amici filing in support of the Pilot include RBC Capital Markets, LLC, the broker-dealer investment banking platform of the Royal Bank of Canada, which "provides equities trading and execution services to retail and

The Commission highlighted six of the criticisms that had been leveled at current fee-and-rebate pricing models as applied to maker-taker exchanges:

    **(1) Broker-dealer conflicts of interest.** Because brokers typically do not pass on to their customers the transaction fees they pay and rebates they garner, the brokers stand to profit if they can minimize their access fees and maximize received rebates. Broker-dealers thus have incentives to choose trading venues that pay rebates, rather than selecting the venue likely to offer the customer the best probability of execution at the best price. Rule 610T, 84 Fed. Reg. at 5,204. Broker-dealers' desire for rebates may, perversely, further widen the gap between these incentives. The popularity of high-rebate maker-taker exchanges may extend the length of order queues on those exchanges, which means that orders at the middle or back of a queue may "wind[] up canceled because price moves away, and then receive[] an inferior price upon the eventual execution." *Id.* & n.17.

---

institutional investors, including large investment managers with trillions of dollars in assets under management," RBC Capital Mkts. Amicus Br. 1; the Investment Company Institute, an "association representing mutual funds, exchange-traded funds, closed-end funds, and unit investment trusts in the United States" that together manage U.S. assets totaling $23.3 trillion on behalf of more than 100 million U.S. shareholders, together with the Council of Institutional Investors, a nonprofit, nonpartisan association of pension and employee-benefit funds, and endowments, managing assets of approximately $4 trillion, with non-voting asset-management firm members who are responsible for managing more than $35 trillion, *see* Investment Co. Inst. Amicus Br. ii; Investors Exchange LLC, a national exchange that does not use rebates; and Better Markets, a nonprofit organization working to ensure stable, fair, and transparent financial markets.

**(2) Market complexity.** High rebates may encourage exchanges to create new order types—and even new exchanges—designed to exploit the maker-taker pricing model. *Id.* at 5,204. An exchange may compete for liquidity providers by creating types of orders "designed to enhance high-speed traders' ability to control the amount of their transaction fees and to obtain priority in exchanges' order books so that their trades execute first, before those of any other investor." Investment Co. Inst. Amicus Br. 16. For instance, by 2015 the NYSE had over 80 order types, "most of which are there to make sure that somebody gets the right rebate." U.S Securities & Exchange Comm'n Division of Trading & Markets, Maker-Taker Fees on Equities Exchanges 22 n.95 (Oct. 20, 2015) (DTM Memo) (quoting NYSE parent company Chairman and CEO).

**(3) Market fragmentation.** Because a single exchange cannot operate with more than one pricing model simultaneously (such as maker-taker or taker-maker), new exchanges have opened to offer different pricing structures and thereby compete with other exchanges and non-exchange markets in catering to specific market participants or trading strategies. *Id.* at 21-22. For instance, NYSE Group, BATS, and NASDAQ OMX each has multiple registered national securities exchanges under its umbrella, differentiated primarily by different fee structures. *Id.* at 22. Just as liquidity providers may be attracted to maker-taker exchanges for their rebates, other investors may turn to taker-maker exchanges or non-exchange trading centers to avoid high access fees or the long order queues on maker-taker exchanges. *See* Rule 610T, 84 Fed. Reg. at 5,204.

**(4) Reduced transparency.** Public prices—displayed by exchanges and provided on trade reports—do not include fee or rebate information, so do not fully reflect net trade prices to

13

investors. *Id.* For example, on an exchange with a maker rebate of $0.002 and a taker fee of $0.003 per share, a maker's displayed quote to buy at $10 would actually pay the taker $9.998 net of fee, and a displayed quote to sell at $10 would net the maker $10.002. DTM Memo at 25.

**(5) Benefits accessible only to high-volume broker-dealers.** Only the largest trading firms have the sophisticated, proprietary trading algorithms that enable them systematically to skirt paying fees and position themselves to take advantage of rebates. They do so at the expense of smaller market participants that trade in the "taker" position, and so pay the access fees that subsidize the rebates. *See* Rule 610T, 84 Fed. Reg. at 5,205 & nn.23-24.

**(6) Excessive intermediation.** The prospect of rebates readily identifiable to "sophisticated market participants" like market makers and proprietary traders using complex algorithms encourages those brokers to transact (and earn rebates) more often, "benefiting short-term intermediaries at the expense of long-term investors." *Id.* at 5,205 & n.24.

These criticisms are widespread. The Commission catalogued the available information and explained in detail why those data were inadequate to allow the Commission to draw conclusions about the current fee structure's effects. The Commission determined it needs data that would be representative across the market and sufficiently robust to prove that the fee structure was indeed the cause of the problems observers attributed to it. *See* Rule 610T, 84 Fed. Reg. at 5,247-53. The Commission scrutinized existing studies, *id.* at 5,248-49 (Battalio Equity Market Study); *id.* at 5,249-50 (the Nasdaq Experiment and Swan Study); *id.* at 5,250 (Options Markets Studies), and data sources, *see id.* at 5,251 (public broker-dealer reports); *id.* (order data); *id.* at

5,251-52 (proprietary broker-dealer data); *id.* at 5,252 (market-center or data-vendor market execution data); *id.* (NMS securities trade and quote data); *id.* (fee and rebate data from exchanges); *id.* at 5,252-53 (alternative trading system fee disclosures). It explained the existing sources' inadequacy to show "whether (and, if so, in which types of NMS stocks) rebates have a positive impact on execution and market quality, or whether they have no or little effect or a negative effect." *Id.* at 5,227.

### III.   The Commission failed to take a position

Presented with these descriptions of how the current fee structure appears to be distorting the market and harming investors, together with explanations of how the current data fall short of confirming that causal link, a reader of Rule 610T might be forgiven for thinking that the Commission has identified a problem and crafted a thoughtful and proportionate pilot to address it. But the Commission stops just short of saying whether it believes the critics or defenders of the fee cap have the better case. And, more to the point in the context of the Pilot it proposes, it has not done enough to identify the position it seeks to test and forecast how the results will guide future regulation.

When pressed at oral argument, the Commission could point to only three lines dispersed across its 104-page rule where it ostensibly identified the problem the Pilot sought to resolve: the Commission stated it believes that "the current fee and rebate system may have resulted in a number of market failures," *id.* at 5,282, that "the Pilot is necessary to study the impact of exchange fees and rebates to determine whether a regulatory response is needed to mitigate the potential distortions," *id.* at 5,238, and that "empirically assessing the various theories, causal impacts, and effects of the transaction

fee-and[-]rebate pricing model is appropriate," *id.* at 5,248. Notably absent from the record is any assessment by the Commission of whether it believes the fee structure or its effects—including any uncertainty, confusion, or lack of market confidence the cap may have engendered—are actually harming investors.

This is in vivid contrast to the Commission's position in initially capping fees in Rule 610(c). Despite "many difficult and contentious issues that ha[d] lingered unresolved for many years," and the "wide range of perspectives on market structure issues," the Commission decided by 2005 that the "time ha[d] arrived . . . when decisions must be made and contentious issues must be resolved so that the markets c[ould] move forward with certainty concerning their future regulatory environment and appropriately respond to fundamental economic and competitive forces." Regulation NMS, 70 Fed. Reg. at 37,497. Recognizing that "[r]eaching appropriate policy decisions in an area as complex as market structure requires an understanding of the relevant facts and of the often subtle ways in which the markets work, as well as the balancing of policy objectives that sometimes may not point in precisely the same direction," the Commission nevertheless "firmly believe[d]" that Rule NMS, including Rule 610(c), would "protect investors, promote fair competition, and enhance market efficiency, and therefore fulfill[] [the Commission's] Exchange Act responsibility to facilitate the development of the [national market system]." *Id.* at 37,499.

The Commission might have taken a similarly clear and confident position here as it did in 2005 and moved ahead to modify the cap or its conditions in view of changed market structures in the intervening years. Perhaps the Commission was overly cautious in failing to do so. But we cannot fault the Commission—in the face of what it extensively describes as

genuine, material, empirical uncertainty—for pausing to plan a data-gathering pilot before committing to a market-wide, non-time-limited rule change.

Faced with such uncertainty, the Commission did not have to pick a side. If market developments appear to be harming investors in ways that the Commission cannot fully understand or resolve without controlled testing of alternative rules, it has the power to conduct such testing through an appropriate pilot. The Commission suggests it cannot be any more definite until it has the data from the Pilot. An open mind is, needless to say, essential for any agency purporting to conduct a rigorous empirical test. But developing a testable hypothesis does not equate to prejudgment. The Commission's recitation of conflicting positions, exhaustive as it may be, is not enough to ground the Pilot within the Commission's regulatory jurisdiction. It may appear formalistic to fault the Commission for saying that a fee structure "may" be distorting the market. But without a statement of the agency's position and plan we cannot distinguish a valid, nonarbitrary effort to protect investors from an invalid experiment that might at bottom be driven by little more than academic curiosity—however genuine and intense.

Where the Commission lacks substantial evidence that a regulated fee structure is causing harm, it still needs a basis, consistent with its mandate, to take action. It has to explain, for example, why the uncertainty is something that the Commission can and should settle. The Commission must state that suspected problems with the current fee structure—or the very uncertainty itself about the fee structure's effects—cause sufficiently significant harms to fair and orderly markets, investor protection, or capital formation that imposing some degree of burden on market participants is justified in order to either resolve the problem or clarify material uncertainty that

itself affects fair and orderly markets. Had the Pilot described a hypothesis, identified its specific regulatory relevance, and stated how it could be proved or disproved with the data the Commission hoped to obtain, we would not be accusing the Commission of acting without any "regulatory agenda" or "regulatory mission." Op. at 23, 24. After all, nobody questions that the existing fee cap is within the Commission's regulatory ambit, nor that the Commission has responsibility and authority for oversight and correction of any ill effects of the existing fee structure on investors and the market. What is missing is a statement of a putative problem within the agency's regulatory purview, the method by which it will be tested, and the kinds of steps the agency might take were the data to support them.

* * *

I accordingly join the court in holding that the Commission acted outside its authority when it promulgated Rule 610T because it acted without a regulatory agenda—meaning without declaring the problem it perceived with the existing regulatory regime. I believe the Commission came very close to acting within its compass. The Commission's Rule 610(c) enabled the equity markets' existing fee-and-rebate structure. As part of its oversight of the markets, the Commission has an obligation to ensure that the existing regime is not harming investors. The potential problems with the current fee structure are apparent from the face of the record. If, on remand, the Commission seeks to continue with the Pilot or otherwise regulate affecting the current fee cap, it must stake a position that there is a problem within its regulatory ambit that it has sufficient reason to think exists and that—at least without contrary evidence accessible through its planned informational intervention—it has grounds to believe continuing the status quo will do more harm than good.